ETHNIC EMPLOYEES OF the
LIBRARY OF CONGRESS, et
al., Appellants

v.

Daniel J. BOORSTIN, et al.

ETHNIC EMPLOYEES OF the
LIBRARY OF CONGRESS, et
al., Appellants

v.

Daniel J. BOORSTIN, Librarian
of Congress.

Nos. 84–5092, 84–5093.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 16, 1984.

Decided Jan. 11, 1985.

Joel D. Joseph, Washington, D.C., for appellants.

John W. Polk, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence and Michael J. Ryan, Asst. U.S. Attys., and Lana Kay Jones, Asst. Gen. Counsel, Library of Congress, Washington, D.C., were on brief, for appellee.

Before WALD, EDWARDS and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

In these two consolidated cases, an organization called the Ethnic Employees of the Library of Congress (EELC) and several of its officers and members appeal from summary judgment dismissing claims against the Librarian of Congress, the Library of Congress, and the United States.[1]

---

1. In No. 84–5092, the EELC and seven officers and members sued the Librarian of Congress, the Library, and the United States. *See* Complaint, No. 84–5092, R. Item 1. In No. 84–5093, the EELC and two of its officers, who are also parties in No. 84–5092, sued the Librarian of Congress. *See* Complaint, No. 84–5093, R. Item 1. All plaintiffs in both actions have appealed.

In its first action, No. 84–5092, the EELC alleged that the Library violated section 717 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16, and the first and fifth amendments to the Constitution by denying the EELC privileges granted to other recognized employee organizations. The district court held that because two EELC officers unsuccessfully asserted constitutional claims based on similar discrimination in a previous lawsuit, claim preclusion barred other EELC members and the organization itself from litigating the constitutional issues in this case. The district court then dismissed the Title VII claims for failure to exhaust administrative remedies. *See Ethnic Employees v. Boorstin,* Civ. Nos. 80–2163 & 82–2264, slip op. at 4–5 (D.D.C. Dec. 20, 1983) [hereinafter cited as District Court Op.]. We find that claim preclusion does not bar the constitutional claims in No. 84–5092 and remand those claims for further proceedings. We affirm the district court's dismissal of the Title VII claims in that case.

The EELC's second action, No. 84–5093, was filed after the Library withdrew recognition of EELC as an official employee organization. The EELC alleged that the Library's decision discriminated on the basis of national origin in violation of Title VII, and also violated the first and fifth amendments. The district court dismissed the constitutional claims on the ground that Title VII is the exclusive remedy for charges of discrimination in federal employment. It then held that the EELC could not make out a prima facie case under Title VII. District Court Op. at 5–7. We find that Title VII is the exclusive remedy for some but not all of the EELC's constitutional claims, and we therefore affirm in part and reverse in part the district court's constitutional holding. We find in addition that the district court misstated the appropriate standard for determining, on a defendant's motion for summary judg-

ment, whether a Title VII plaintiff may succeed at trial in establishing a prima facie case. We therefore vacate summary judgment on the Title VII claims in No. 84–5093 and remand those claims, together with the constitutional claims that may be maintained apart from Title VII, for further proceedings.

## I. No. 84–5092

### A. *Background*

The EELC is an organization of Library employees "dedicated to promoting non-discriminatory treatment of ethnic and racial minorities at the Library." Affidavit of George E. Perry ¶ 3, R. Item 7.[2] In 1973, George E. Perry, then an employee of the Library and an appellant in both of the cases before us today, founded the EELC. *Id.* ¶¶ 2–3. The Library agrees that from 1973 until approximately April of 1981, the EELC complied with Library of Congress Regulation [hereinafter cited as LCR] 2022–2 (1975), which governs the official recognition and conduct of cultural and social organizations composed of Library employees. Affidavit of Doris E. Pierce ¶ 6, R. Item 15, Exhibit 5.

However, the two principal officers of the EELC, George E. Perry and Howard R.L. Cook, have both been involved in numerous controversies with the Library administration, some of which related to activities they conducted in connection with the EELC. In 1974, Perry, the president of the EELC, was suspended without pay for ninety days based on various charges of misconduct, among them the authorship of a published letter that was highly critical of Library policies. *See* Affidavit of George E. Perry ¶ 4, R. Item 7. Perry alleges that the Library subsequently opened mail addressed to him as president of the EELC, unsuccessfully pressured him not to testify against the nomination of Daniel J. Boorstin as Librarian of Con-

---

*See* Notice of Appeal, No. 84–5092, R. Item 22; Notice of Appeal, No. 84–5093, R. Item 12.

For brevity, we refer to appellants in both actions as "EELC," and to appellees in both actions as "the Library."

**2.** Record citations in Part I and Part II of this opinion are to the record in No. 84–5092 and the record in No. 84–5093 respectively.

gress, and otherwise harrassed him. In 1977, the Library discharged Perry, in part for allegedly making false and malicious statements about another Library employee.

Cook, the vice president of the EELC, has been involved in similar controversies. Some of these have apparently centered on his activities on behalf of the EELC and the Black Employees of the Library of Congress (BELC), a separate employee organization not involved in these lawsuits.[3] Others centered on Cook's and Perry's individually expressed opposition to various Library actions and policies. In July of 1977, Cook was suspended without pay for allegedly making statements similar to those for which Perry was discharged.

Cook and Perry have previously brought two lawsuits concerning these events. One of these actions, brought in the United States Court of Claims against the United States, challenged the statutory and constitutional validity of the Library of Congress regulation under which Perry was discharged and Cook was suspended. Perry also argued that in any event, discharge was an unduly harsh punishment for his conduct. The court rejected these claims and granted summary judgment for the United States. *Cook v. United States*, No. 100–80C, mem. at 2, 5–6 (Ct.Cl. Mar. 13, 1981) (disposition reported at 652 F.2d 70), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981) [hereinafter cited as *Cook I*].

In February of 1979, Cook and Perry brought another action in the United States District Court for the District of Columbia against the Librarian of Congress. This action sought damages, rescission of the disciplinary measures imposed on Cook and Perry, and wide-ranging equitable relief. Among the many allegations of mistreat-

ment and discrimination were some that described Library efforts to impede actions Cook and Perry took on behalf of the EELC and the BELC, and retaliation against Cook and Perry based on those actions. The district court dismissed the action on February 11, 1980. *Cook v. Boorstin*, Civ. No. 78–2312 (D.D.C. Feb. 11, 1980) [hereinafter cited as *Cook II.*]. It ruled that Title VII was the exclusive judicial remedy for claims of discrimination in federal employment, and the plaintiffs therefore could not assert claims under the first and fifth amendments. Because Cook and Perry were unwilling to proceed only on their Title VII claims, those claims were also dismissed. *Id.* This court dismissed Cook and Perry's appeal on the grounds that they had waived their Title VII claims, and that the judgment against them in the court of claims was res judicata as to their other statutory and constitutional claims. *See Cook v. Boorstin*, No. 80–1288 (D.C. Cir. Sept. 11, 1981) (disposition reported at 670 F.2d 1234).

The EELC, Perry, Cook, and five other members of the EELC brought the first of the consolidated actions involved in this appeal on August 22, 1980. *See* Complaint, R. Item 1. They asserted claims against the Librarian of Congress, the Library, and the United States under section 717 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16, and the first and fifth amendments. The complaint alleged that the Library had attempted to gain access to the EELC's membership list, denied its request for office space, and refused it other services generally provided to recognized organizations. *See* Complaint ¶ 14, R. Item 1. The complaint also alleged that the Library refused the EELC's request for a dues checkoff system, *id.* ¶ 15; interfered with the relationship between the EELC and the BELC, *id.* ¶ 16; and took actions

---

**3.** According to documents filed by the appellants, Howard R.L. Cook is the executive director of the BELC, and George E. Perry is one of its officers. *See* Affidavit of George E. Perry ¶¶ 3–4, R. Item 7. The relationship between the BELC and the EELC was apparently among the sources of friction between the Library and the EELC. A letter from a Library officer to Perry

commented that the BELC "had been a labor organization .... When the provisions of [former LCR 2022–2] were superseded by the issuance of LCR 2026, BELC unsuccessfully sought exclusive recognition in the representation election." Letter from Doris E. Pierce to George E. Perry at 2 (Apr. 29, 1980), R. Item 15, Exhibit 7.

with the purpose and effect of suppressing criticism by EELC members of Library policies, *see id.* ¶¶ 24–26. Finally, the complaint asserted that "EELC members are deprived of the right to have the effective assistance of the organization in the processing of personnel grievances within the Library," *id.* ¶ 28, allegedly in violation of the fifth amendment.

The district court concluded that the EELC was in privity with the *Cook II* plaintiffs, and that the EELC's claims were the same, for purposes of claim preclusion, as those asserted in *Cook II.* It therefore held that res judicata barred the EELC's constitutional claims. The court then dismissed the Title VII claims for failure to exhaust administrative remedies. District Court Op. at 4–5.

B. *Preclusion of the Constitutional Claims*

■ Persons who are not parties to an action ordinarily are not bound by the judgment in the action. *See* 1 Restatement of Judgments, Second § 34(3) (1981). Nonparties to an action are said to be in "privity" with a party and therefore bound by a judgment only when, under any of several related but distinct exceptions to the general rule, "the relationship between one or more persons is such that a judgment involving one of them may justly be conclusive upon the others, although those others were not party to the lawsuit." *Gil & Duffus Servs., Inc. v. Islam,* 675 F.2d 404, 405 (D.C.Cir.1982) (per curiam) (citation omitted).

There is no claim in this case that all EELC members are in "privity" with Cook and Perry "under the traditional definition of the term; they are not persons who 'claim[ ] an interest in the subject-matter affected by the judgment *through* or *under* one of the parties, *i.e.,* either by inheritance, succession, or purchase.' " *Id.* at 406 (quoting Comment, *Privity and Mutuality in the Doctrine of Res Judicata,* 35 Yale L.J. 607, 608 (1926)) (emphasis in original). Instead, the district court concluded that EELC members "had an undisclosed interest" in the suit Cook and Perry previously brought in the district court. District Court Op. at 4. We interpret this ruling to mean that Cook and Perry had in effect previously sued as representatives for EELC's members.[4]

The complaint in *Cook II,* however, does not suggest that Cook and Perry were suing in a representative capacity. Cook and Perry were the only plaintiffs of record, and that fact alone strongly suggests that the district court erred in finding that they acted in a representative capacity:

> The traditional representation rules begin with a showing that the prior action was brought by or against a party who was acting in a representative capacity. It is not alone enough that the party had a representative capacity, as for example a trustee of an express trust. If there is no indication in the pleadings or otherwise that the action involved the representative capacity, it must be treated as an individual action. As with other matters of modern pleading and procedure, however, it should be sufficient to show that the action was in fact tried and decided as one that involved the representative capacity of a party.

18 C. Wright, A. Miller & E. Cooper, 18 Federal Practice and Procedure § 4454 at 459 (1981) (footnote omitted).[5]

■ We think that Cook and Perry's complaint, fairly read, does not disclose

---

4. In other contexts, the district court's phrase might be understood to mean that the EELC had controlled the earlier litigation, which could lead to the application of issue preclusion against it. *See, e.g., Montana v. United States,* 440 U.S. 147, 153–55, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979). However, the district court did not so find, and the record at the present stage of the proceedings would not appear to support such a conclusion.

5. *See also* 1 Restatement of Judgments, Second § 36(1) (1982); *id.* comment b ("The essential question is whether there is a disclosed relationship in which the party is accorded authority to appear as a party on behalf of others."); 1B J. Moore, J. Lucas & T. Currier, Moore's Federal Practice ¶ 0.411[3.—1] at 417–18 (1984).

that they were suing on behalf of the EELC. It is true that the complaint does include, among its many allegations, some assertions that Cook and Perry were discriminated against as officers of the EELC.[6] Similarly, among the fifteen paragraphs specifying the relief requested appears a prayer "[t]hat the Library be ordered to refrain from its divers acts of harrassment, intimidation and obstruction of Plaintiffs and their organizations coincident with organizational activity." Complaint ¶ 12 at 20, *Cook II*, R. Item 12, Exhibit 3. But the allegations relating to the EELC in the complaint are clearly intended to describe part of a broader campaign of harrassment and discrimination that the Library allegedly undertook against Cook and Perry. To the extent that the Library's allegedly illegal acts against the EELC were directed at Cook and Perry personally, they could properly be complained of in their individual actions. Nor is there any sign in the record before us that the truncated proceedings in *Cook II* were conducted as though that case was a representative lawsuit. The district court's opinion treated Cook and Perry's sudden abandonment of their Title VII claims as a decision properly left entirely to them. That stance, while appropriate in an individual action, would be questionable in an action that determined the Title VII rights of all other EELC members as well. Similarly, this court's memorandum in *Cook II* plainly assumes that the lawsuit was in fact exactly what it purported to be in form: an action asserting claims by two individuals. *See Cook v. Boorstin*, No. 80-1288 (D.C.Cir. Sept. 11, 1984) (disposition reported at 670 F.2d 1234).[7]

Finally, we note that strong policy considerations support our reluctance to look beyond the gravamen of the complaint and the district court's opinion for isolated hints that Cook and Perry acted in a representative capacity. EELC members other than Cook and Perry were not protected by any of the procedural safeguards that are required in class actions. *See* Fed.R.Civ.P. 23. Holding *Cook II* to have been a de facto class action would thus risk serious inequity to EELC members who, even had they known of the lawsuit, would have had little reason to suppose that their rights were being adjudicated. Moreover, the rules governing the preclusive consequences of suits brought by an unincorporated association are quite complex, and may vary depending on whether the association brought suit as a jural entity in its own right or as a representative of its members' rights. *See* Fed.R.Civ.P. 17(b)(1) (unincorporated association may sue to enforce substantive federal right); Fed.R. Civ.P. 23.2 (suit by unincorporated association may proceed as class action); 1 Restatement of Judgments, Second § 35 & comment d (1982); *id.* reporter's note to comment d at 357 (authorities on res judicata effect of representative suit brought by unincorporated association are "in a state of profound confusion and discord"); 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4456 (1981). The Library asks us to draw highly questionable inferences from scattered allegations in a complaint brought by two individuals; decide exactly what rights of the EELC and its members were at issue in the resulting "inferred" representational lawsuit; and then determine the preclusive consequences of that lawsuit for the case before

---

6. *See* Complaint ¶¶ 3, 5, 15(j), 24–28, 30(a), 31(a)–(b), 36, 44–45, 49–50, 73, 79, 81, 84, 87, *Cook II*, R. Item 12, Exhibit 3.

7. The Library argues in this court, as it did in the district court, that *Cook I* as well as *Cook II* bars the EELC's constitutional claims in No. 84–5092. The opinion of the court of claims in *Cook I*, however, makes it absolutely plain that the court was dealing with nothing more than a challenge by two employees to disciplinary measures imposed by the Library. There is

thus no basis for holding that Cook and Perry represented EELC in *Cook I*.

In addition, we note that the appellate holding in *Cook II* rested entirely on the preclusive effect of *Cook I*. To apply claim preclusion in this case would require us to rule that, despite this fact, the preclusive consequences of *Cook II* reach far beyond any reasonable view of the preclusive consequences of *Cook I*. The facts of this case do not require so anomalous a result.

us. We prefer the more straightforward course of reading the *Cook II* complaint to assert complaints only on behalf of the named plaintiffs.[8]

## C. *The Title VII Claims: Exhaustion of Administrative Remedies*

Section 717 of Title VII of the Civil Rights Act of 1964, which was added by section 11 of the Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, 86 Stat. 103, 111, expressly prohibits employment discrimination against employees of the Library of Congress on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e–16(a). Section 717(c) authorizes a Library employee to bring suit under Title VII after 30 days following notice of final action on an administrative complaint of discrimination, or after 180 days following filing of the administrative complaint, if no final action has been taken within that time. *See* 42 U.S.C. § 2000e–16(c); *Nordell v. Heckler*, 749 F.2d 47 (D.C. Cir.1984). As this court said in *Kizas v. Webster*, 707 F.2d 524 (D.C.Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984):

Congress did not casually impose the requirement that a person charging violation of Title VII by a federal agency initiate his or her complaint with the agency. Nor is the requirement a technicality. Rather, it is part and parcel of the congressional design to vest in the federal agencies and officials engaged in hiring and promoting personnel "primary responsibility" for maintaining nondiscrimination in employment.

8. A final major question posed by association representation goes to litigation that is conducted by some members rather than the association itself. For most cases, it should be clear that mere common membership does not create power in one member to represent others. Preclusion of other members is likely to be achieved, if at all, on the theory of virtual representation ....
18 C. Wright, A Miller & E. Cooper, Federal Practice and Procedure § 4456 at 493 (1981). The doctrine of virtual representation has a highly uncertain scope, *see id.* § 4457 (1981); *cf.* 2 Restatement of Judgments, Second § 62 (1982) ("Conduct Inducing Reliance on an Adjudication"), and the parties have not discussed it in their briefs. Perhaps the broadest statement of the doctrine is in *Aerojet-General Corp. v. Askew*, 511 F.2d 710 (5th Cir.), *appeal dismissed and cert. denied*, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975), in which the Fifth Circuit declared that "[u]nder the federal law of res judicata, a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative." *Id.* at 719 (citations omitted). That court qualified this statement in *Pollard v. Cockrell*, 578 F.2d 1002 (5th Cir.1978), which held that "[v]irtual representation demands the existence of an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues." *Id.* at 1008; *cf. Southwest Airlines Co. v. Texas Int'l Airlines, Inc.*, 546 F.2d 84, 97 & n. 50 (5th Cir.) (noting "inconsistent" and confusing character of doctrine), *cert. denied*, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977). In general, cases in which courts have based preclusion on virtual representation have involved special factors such as "substantial elements of participation in the first litigation, apparent consent to be bound, apparent tactical maneuvering, or close relationships between the parties," such as that between family members. 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4457 at 498–99 (1981) (footnotes omitted) (collecting cases); *see, e.g., United States v. Geophysical Corp.*, 732 F.2d 693, 697–98 (9th Cir.1984) (collaterally estopping limited partners and partnership based on previous litigation by general partner).

Even if we were to adopt an expansive view of virtual representation as the law of this circuit, we would be unwilling to hold that the interests of the *Cook II* plaintiffs were "closely aligned" with the interests of the EELC and its members in the present case in a way that justifies preclusion. As we discuss in the text, neither the pleadings in *Cook II, see Oneida Indian Nation v. New York*, 732 F.2d 261, 266 (2d Cir.1984), nor anything we know about the conduct of that litigation, *cf. Jackson v. Hayakawa*, 605 F.2d 1121, 1126 (9th Cir.1979), *cert. denied*, 445 U.S. 952, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980), nor anything we know about the factual relationship between the *Cook II* plaintiffs and other EELC members, *see Aerojet*, 511 F.2d at 719–20, suggests that the *Cook II* plaintiffs can fairly be regarded as acting on behalf of the EELC and all of its members. Moreover, any such holding would raise serious questions as to whether the *Cook II* plaintiffs adequately represented the EELC in their conduct of that litigation and, if not, whether the EELC and its members are nonetheless bound. *See* 1 Restatement of Judgments, Second § 42(1)(e) (1982); 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4457 at 502 (1981).

*Id.* at 544 (quoting 42 U.S.C. § 2000e–16(e)) (citations omitted).

The district court dismissed the Title VII claims in No. 84–5092 for failure to exhaust administrative remedies. The court noted that sections 6D and 12 of LCR 2010–3.1 specifically provide that an organization may file a complaint of discrimination.[9] Cook and Perry submitted affidavits to the district court claiming that the coordinator of the equal opportunity program at the Library repeatedly told them that Library regulations do "not allow organizations to file complaints of discrimination concerning discrimination against the organization." Affidavit of Howard R.L. Cook ¶ 3, R. Item 9; *see also* Affidavit of George E. Perry ¶ 3, R. Item 9. The coordinator during the relevant time filed an affidavit stating that he had "no knowledge of having made" the statements attributed to him in Cook's and Perry's affidavits. Affidavit of Thomas C. Brackeen ¶ 4, R. Item 12, Exhibit 5. The Library also submitted a 1976 letter from the coordinator accepting a "third party" discrimination complaint filed by Cook, another person, and the BELC. Letter from Thomas C. Brackeen to James R. Barnett (May 6, 1976), R. Item 12, Exhibit 4. In the Library's view, the letter demonstrates that it does accept organizational complaints, and that Cook was aware of this policy. The district court evidently either disbelieved Cook's and Perry's affidavits, or regarded them as an insufficient excuse for the failure to file an administrative complaint.

In *Kizas,* this court commented that:

> Because Congress has unambiguously directed federal employment discrimination complainants to proceed first before the agency charged with discrimination, we have grave doubts whether any futility doctrine can be stretched to sanction court adjudication of a Title VII action when no party to the action has ever filed an initial charge with the agency.

707 F.2d at 544–45 (footnote omitted). Similarly, in *Siegel v. Kreps,* 654 F.2d 773 (D.C.Cir.1981), we rejected a federal employee's argument that his failure to file a timely administrative complaint of discrimination was excused by reasonable reliance on erroneous advice from a Civil Service Commission supervisory employee. The *Siegel* court disagreed with the employee's contention that, on the facts of that case, he justifiably relied on the erroneous advice allegedly given, but the court went on to note that:

> Even if appellant had established a justifiable reliance on [the supervisory employee's] alleged erroneous advice, he would, at most, be entitled to a waiver of the time limits for the initiation of a

---

9. *District Court Op.* at 5. Section 6D of LCR 2010–3.1 (1974) provides:

> If an allegation of discrimination is filed by a group of grievants reflecting an individual complaint which they have in common, and it otherwise satisfies the requirements of this section, it shall be accepted for processing under this Regulation as a single complaint, with a joint investigation and, if necessary, a joint hearing .... If the allegation filed by the group does not reflect an individual complaint which they have in common, it shall be treated as a third party allegation and processed under Section 12, below.

Section 12 of LCR 2010–3.1 (1974) provides in part:

> This Section shall apply to general allegations by organizations, or other third parties, of discrimination in personnel matters within the Library which are unrelated to an individual complaint of discrimination. These shall be considered third party allegations and shall be processed as follows:

> A. Such allegations shall be filed, in writing, directly with the Coordinator, who shall, upon accepting the same ... assign them to an Equal Opportunity Officer.

> B. In so filing, the organization or other third party shall state the allegations with sufficient specificity so that the Officer may fully investigate it. The Officer may require such additional specificity as necessary to proceed with the investigation.

Section 717(a) of Title VII, 42 U.S.C. § 2000e–16(a), protects "employees and applicants for employment" from illegal discrimination. Section 701(f), 42 U.S.C. § 2000e(f), defines "employee" as "an individual employed by an employer," with certain exceptions. In light of these provisions, we interpret the EELC to argue on behalf of its members that measures taken against the organization have resulted in prohibited discrimination against the members.

complaint with the administrative agency rather than to the right to institute a civil action. Congress intended that administrative agencies should have an opportunity to consider a federal employee's discrimination claim, because such a process promotes dispute resolution through accommodation rather than through litigation. While waiver of the time limits for initiating an administrative complaint through the administrative process ... might have been available to the appellant, he never requested such a waiver. Accordingly, we need not decide whether such a waiver, had it been requested, should have been granted.

*Id.* at 778 n. 14 (citations omitted).

■ Here, as in *Siegel*, the Title VII complainant argues not that principles of equity excuse the failure to file a timely administrative complaint, but rather that we should entirely dispense with the requirement of an administrative complaint. *Cf. Bethel v. Jefferson,* 589 F.2d 631, 640–47 (D.C.Cir.1978). This we will not do on so slight an excuse as the facts of this case offer. Even assuming that the coordinator of the Library's equal opportunity program told Cook and Perry that he would not receive complaints of discrimination against an organization, the Library's regulations and its apparent past practice, of which Cook had personal experience, certainly gave Cook, Perry, and the EELC ample reason to understand that the coordinator's position did not represent Library policy. Nonetheless, the EELC did not actually submit an administrative complaint, or, so far as the record indicates, even protest in writing to the coordinator or to anyone else at the Library about the coordi-

nator's alleged defiance of Library regulations. In these circumstances, we hold that the district court correctly concluded that the EELC had neither exhausted its administrative remedies nor offered any legally adequate excuse for its failure to do so. The Library was therefore entitled to summary judgment on the EELC's Title VII claims in No. 84–5092.

## II. No. 84–5093

### A. *Background*

The EELC's second lawsuit against the Library arises from the Library's decision to terminate its recognition of the EELC as an employee organization. On April 29, 1980, a staff relations officer of the Library of Congress formally informed Perry, as president of the EELC, that the Library was considering withdrawal of recognition from the organization. The Library's letter suggested that the EELC might have violated LCR 2022–2 by failing to conduct its affairs in an orderly manner and in accordance with democratic principles, and by infringing upon the exclusive rights of labor organizations.[10] The letter asked that Perry provide various items of information to assist the Library in deciding whether the EELC was entitled to continued recognition, including a membership list. *See* Letter from Doris E. Pierce to George Perry (Apr. 29, 1980), R. Item 7, Exhibit 7. A lively correspondence followed between the EELC and the Library, *see* R. Item 7, Exhibits 8–16, during which the Library explained that it required only a list of at least fifty EELC members on the Library staff and not a full member-

---

**10.** Section 4A of LCR 2022–2 (1975) provides in part:

When applying for recognition under this Regulation, an organization shall provide evidence that it meets the following criteria:
. . . .
(2) it is organized and open to all staff members on a Library-wide basis, but is not a labor organization as defined by LCR 2026;
. . . .
(4) it is organized to conduct its affairs in an orderly manner and in accordance with democratic principles and practices;

(5) it provides proof of membership of not less than 50 employees of the Library of Congress . . . .

Section 4C of LCR 2022–2 (1975) provides in part:

The Director of Personnel ... may withdraw recognition of any organization when:
(1) it fails to meet or to conform with the requirements of this Regulation, as set out in A. above; or
(2) its activities infringe upon the exclusive functions and rights of labor organizations . . . .

ship list, *see* Letter from Doris E. Pierce to Joel D. Joseph (June 20, 1980), R. Item 7, Exhibit 8; Letter from Doris E. Pierce to George E. Perry at 2 (Mar. 26, 1981), R. Item 7, Exhibit 12. The EELC refused to supply such a list, claiming that the Library's effort to force partial disclosure of its membership list violated the first amendment. *See* Letter from George E. Perry to Doris E. Pierce at 1 (Apr. 5, 1981), R. Item 7, Exhibit 16. On September 16, 1981, the Director of Personnel at the Library informed the EELC that its recognition was withdrawn. He stated that:

> [The EELC has] continually sought to encroach upon rights granted exclusively to the recognized labor organizations and you have not satisfied Staff Relations that you have a "membership of not less than 50 employees of the Library of Congress," as required by LCR 2022–2, Section 4A(5). Scarce benefits are extended to organizations that meet the latter criterion on the basis that a substantial number of Library employees are being served by the organization. To give those benefits to an organization which we have no reason to believe holds annual membership meetings and consists of at least 50 Library staff members, would be a wasteful expenditure of the Library's resources.

Letter from Louis R. Mortimer to George E. Perry at 1 (Sept. 16, 1981), R. Item 1, Exhibit 1. Evidently the EELC administratively appealed this decision. *See* Complaint ¶ 11, R. Item 1. When that appeal failed, Cook, Perry, and the EELC filed an administrative complaint of discrimination on behalf of the EELC and its members. R. Item 1, Exhibit 2. The Library ultimately refused to accept the complaint because the EELC allegedly declined, after repeated requests, to support the complaint with specific enough facts to make an effective investigation possible.[11] *See* Letter from Donald C. Curran to Howard R.L.

Cook (July 28, 1982), R. Item 1, Exhibit 3. The EELC sued the Library on August 11, 1982, asserting that the Library's version violated the first and fifth amendments and Title VII.

### B. *The Constitutional Claims: The Effect of Brown v. General Services Administration*

The thrust of the EELC's first amendment argument is that the Library's withdrawal of recognition denied the EELC access to Library facilities "on an equal basis with other groups." Complaint ¶ 16, R. Item 1. This denial, the EELC alleged, was based upon the enforcement of "discriminatory and unconstitutional requirements," and had the purpose and effect of suppressing the EELC's criticisms of Library policies. *Id.* ¶¶ 17–18. The EELC also alleged that the Library had deprived EELC members of the effective assistance of their organization in the processing of personnel grievances, in purported contravention of the fifth amendment, *id.* ¶ 20; and that the Library had in some way denied the EELC equal protection of the laws, *id.* ¶ 21.

■ The district court dismissed these claims, relying on *Brown v. General Services Administration*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), which held that for federal employees, "§ 717 of the Civil Rights Act of 1964, as amended, provides the exclusive judicial remedy for claims of discrimination in employment." *Id.* at 835, 96 S.Ct. at 1969. *Brown* rested on the Court's view that

> The balance, completeness, and structural integrity of § 717 are inconsistent with the ... contention that the judicial remedy afforded by § 717(c) was designed merely to supplement other putative judicial remedies.

*Id.* at 832, 96 S.Ct. at 1967. The Court's discussion showed particular concern over

---

11. *See* LCR 2010–3.1 § 12B (1974) (quoted *supra* note 9). The record does not contain details of the Library's request for further information and the responses, if any, of the EELC. We express no opinion on whether the EELC's filing

of an administrative complaint, followed by its alleged failure to provide additional information, constituted adequate exhaustion of administrative remedies.

the possibility that litigants might evade "the rigorous administrative exhaustion requirements and time limitations" of section 717 by recasting Title VII claims as claims under other statutes and so frustrate the legislative policies underlying Title VII. *See id.* at 833, 96 S.Ct. at 1968; *see also Great Am. Federal Savings & Loan Ass'n v. Novotsky*, 442 U.S. 366, 372–78, 99 S.Ct. 2345, 2349–52, 60 L.Ed.2d 957 (1979) (deprivation of right under Title VII cannot form basis for suit under 42 U.S.C. § 1985(3)). Allowing federal employees to recast their Title VII claims as constitutional claims would clearly threaten those same policies. For that reason, this circuit has repeatedly held that federal employees may not bring suit under the Constitution for employment discrimination that is actionable under Title VII.[12] Thus, the district court properly dismissed those constitutional claims that simply restated claims of racial, ethnic or other discrimination cognizable under Title VII, or claims of retaliation for the invocation of Title VII rights.[13]

■ However, not all of the EELC's constitutional claims could be asserted in a Title VII lawsuit. For example, the EELC alleges that the Library has punished the EELC and its members for their constitutionally protected criticisms of Library policies. *Cf., e.g., Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v.* *Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Clark v. Library of Congress*, 750 F.2d 89 at 94–95, (D.C.Cir. 1984). Similarly, the EELC claims that the Library cannot require disclosure of its membership as a condition of official recognition, *cf., e.g., Buckley v. Valeo*, 424 U.S. 1, 15, 24–25, 96 S.Ct. 612, 632, 637, 46 L.Ed.2d 659 (1976) (per curiam); *Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539, 543–44, 83 S.Ct. 889, 892, 9 L.Ed.2d 929 (1963), and that EELC members have some "due process" right to the continued recognition of their organization. Whatever their merits may be, these assertions clearly fall outside the scope of Title VII, and thus could not form the basis for an administrative complaint under that statute. *See Porter v. Schweiker*, 692 F.2d 740 (11th Cir.1982) (federal employee not required to file administrative complaint before challenging discharge allegedly based on constitutionally protected criticisms of superior, since EEOC lacked power to investigate such a complaint). *Brown's* inquiry into the legislative history of section 717 focused on whether federal employees should be able to bring parallel actions under both Title VII and other provisions of federal law to redress the same basic injury. Nothing in that history even remotely suggests that Congress intended to prevent federal employees from suing their employers for constitutional violations against which Title VII provides no protection at all.[14] We intimate no view as to the

---

**12.** *See Kizas v. Webster*, 707 F.2d 524, 542 (D.C. Cir.1983) (fifth amendment claim based on race and sex discrimination barred), *cert. denied,* — U.S. ——, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984); *Lawrence v. Staats*, 665 F.2d 1256, 1257, 1259 (D.C.Cir.1981) (fifth amendment claim based on race discrimination would be barred if § 717 applied); *Torre v. Barry*, 661 F.2d 1371, 1372, 1374 (D.C.Cir.1981) (fifth amendment claim based on race discrimination barred); *Hofer v. Campbell*, 581 F.2d 975, 976, 978 (D.C.Cir.1978) (fifth amendment claim based on national origin discrimination barred), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979); *Richardson v. Wiley*, 569 F.2d 140, 141 (D.C.Cir. 1977) (per curiam) (fifth amendment claim based on race discrimination barred); *cf. Morris v. Washington Metropolitan Area Transit Auth.*, 702 F.2d 1037, 1039–40 (D.C.Cir.1983) (if em-

ployer in case were federal agency, first amendment claim for retaliatory discharge prohibited by Title VII would be barred).

**13.** *See Porter v. Adams*, 639 F.2d 273, 277–78 (5th Cir.1981) (§ 2000e–16 prohibits retaliation against federal employee invoking Title VII rights).

**14.** *See Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976) (discussed with respect to § 717 in *Davis v. Passman*, 442 U.S. 228, 247, 99 S.Ct. 2264, 2278, 60 L.Ed.2d 846 (1979)); *Ray v. Nimmo*, 704 F.2d 1480, 1485 (11th Cir.1983) (§ 717 does not foreclose federal employee's suit for deprivation of constitutionally protected property interest without due process); *Brosnahan v. Eckerd*, 435 F.Supp. 26, 28 (D.D.C.1977); *cf. Davis v. Passman*, 442 U.S.

likelihood that the EELC will prevail on constitutional claims for which Title VII could not provide a remedy. We do, however, hold that Congress did not intend for Title VII to displace those claims, and therefore remand them to the district court for further proceedings.

### C. *The Title VII Claims*

 Finally, the district court dismissed the EELC's Title VII claims based on the withdrawal of recognition for failure to establish a prima facie case.[15] The district court stated that:

> The Supreme Court characterized plaintiffs' burden of establishing a *prima facie* case of disparate treatment as "onerous." Under this "onerous" burden, plaintiffs must prove by a preponderance of the evidence that (1) they are members of a minority group; (2) the Library's request for a membership list of at least fifty members was not applied equally across the board, and (3) the discriminatory application of [the Library regulation requiring disclosure of at least fifty members who are Library employees] was done with a discriminatory motive. Plaintiffs have not met their

burden as a prepondrance [sic] of the evidence does not establish that defendants enforced [the regulation] in a discriminatory manner with a discriminatory intent. Rather, it is apparent that defendants required all employee organizations to meet the requirements of LCR 2022–2.

District Court Op. at 6–7 (citations omitted). We believe this passage reflects a misunderstanding of both the elements of a prima facie case under Title VII and the appropriate allocation of burdens on a motion for summary judgment.

In *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court commented that "[t]he burden of establishing a prima facie case of disparate treatment is *not* onerous." *Id.* at 253, 101 S.Ct. at 1093 (emphasis added). When a Title VII plaintiff alleges that an employer has discriminatorily refused to hire him, the Court has described the appropriate allocation of burdens as follows:

> A plaintiff alleging one instance of discrimination establishes a prima facie case justifying an inference of individual ra-

---

228, 246–47, 99 S.Ct. 2264, 2277–78, 60 L.Ed.2d 846 (1979) (implied cause of action and damages remedy under fifth amendment against congressman not foreclosed by § 717, where § 717 does not cover congressional employee).

**15.** The EELC also claimed that the Library's decision was arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 702. In *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980), the Supreme Court noted that the Library of Congress is not an agency under the Freedom of Information Act. *Id.* at 145, 100 S.Ct. at 695; *see* 1 J. O'Reilly, Federal Information Disclosure § 5.02 at 5–5 (1984); *cf.* 36 C.F.R. § 703.1 (1984). As the definition of an agency in the Freedom of Information Act, 5 U.S.C. § 552(e), incorporates the definition of an agency under the Administrative Procedure Act, 5 U.S.C. § 551(1), it follows that the Library is not an agency under the Administrative Procedure Act. The district court was therefore correct in granting summary judgment for the Library on the claim under that act.

The EELC has pursued its claim that the Library applied LCR 2022–2 arbitrarily and capriciously only through the Administrative Proce-

dure Act. But even if we were to consider a "nonstatutory" claim properly before us, *see generally* W. Gellhorn, C. Byse, P. Strauss, Administrative Law: Cases and Comments 919–23 (1979); L. Jaffe, Judicial Control of Administrative Action 152–96 (1965), we would still not be required to decide what review might conceivably be available to the EELC. *Cf. Ringer v. Mumford*, 355 F.Supp. 749 (D.D.C.1973) (enjoining Librarian of Congress from appointing Register of Copyrights without following Library regulations). The EELC has met the Library's efforts to prove even-handed enforcement of its regulation only with claims that the Library acted from motives prohibited by Title VII and the Constitution. We think that even assuming the EELC could assert an action for nonstatutory review that does not repeat the substance of its Title VII and constitutional claims, it has failed to raise a genuine issue of material fact that might allow that action to succeed. To the extent that an action for nonstatutory review would simply cover the same ground as the EELC's Title VII and constitutional claims, it is entirely superfluous in this case.

cial discrimination by showing that he (1) belongs to a racial minority, (2) applied and was qualified for a vacant position the employer was attempting to fill, (3) was rejected for the position, and (4) after his rejection, the position remained open and the employer continued to seek applicants of the plaintiff's qualifications. Once these facts are established, the employer must produce "evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason." [*Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094]. At that point, the presumption of discrimination "drops from the case," *id.*, at 255 n. 10 [101 S.Ct. at 1095 n. 10], and the District Court is in a position to decide the ultimate question in such a suit: whether the particular employment decision at issue was made on the basis of race. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff regarding the particular employment decision "remains at all times with the plaintiff," [*id.* at 253, 101 S.Ct. at 1093], and in the final analysis the trier of fact "must decide which party's explanation of the employer's motivation it believes." *United States Postal Service Board of Governors v. Aikens*, 460 U.S. [711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983)].

*Cooper v. Federal Reserve Bank*, — U.S. ——, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984) (citations omitted). These standards can be readily adapted to the EELC's claim. We think that if EELC members could show that (1) they belong to a protected group under Title VII; (2) they sought continued official recognition from the Library for their organization and qualified for recognition under all uniformly enforced standards; (3) they were denied recognition under the disputed regulation; and (4) other applicants seeking continued recognition for their organizations who were not members of the same protected group or groups were not required to conform to the disputed regulation, the EELC members would have established a prima

facie case under Title VII. *Cf. Krodel v. Young*, 748 F.2d 701, 709 (D.C.Cir.1984) (age discrimination claim applying Title VII framework); *Freeman v. Lewis*, 675 F.2d 398, 400 (D.C.Cir.1982) (stating Title VII prima facie burden in discriminatory refusal to promote claim); *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C.Cir.1981) (same).

The district court evidently required direct proof of discriminatory motive as an element of the plaintiff's prima facie case. This was error. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983); *Krodel*, 748 F.2d at 707–08 & nn. 4–5. Proof of the four elements sketched above would be sufficient to establish a prima facie case and thus shift the burden of production to the Library in the way *Cooper* describes.

■ The district court also remarked that the plaintiffs had failed to establish a prima facie case by a preponderance of the evidence. District Court Op. at 7. In ruling on the Library's motion for summary judgment, however, the court was required to determine whether the movants had shown the absence of any genuinely disputed issue of material fact. *See, e.g., Williams v. Washington Area Metropolitan Transit Auth.*, 721 F.2d 1412, 1414–15 (D.C.Cir. 1983). Elsewhere in its opinion, the district court referred to the standards governing summary judgment motions, *see* District Court Op. at 2, and perhaps its reference to a preponderance of the evidence was merely a verbal slip. If the district court indeed found that the EELC had not established any genuinely disputed issue over the Library's allegedly discriminatory enforcement of LCR 2022–2, then it properly dismissed the Title VII claim under the framework sketched above.

If these Title VII claims were the only claims on appeal, we might feel constrained to review the factual record for ourselves to determine if such an issue exists. However, in light of our remand on other claims in these cases, we prefer to vacate the district court's holding on the Title VII claims in No. 84–5093 and allow it to recon-

sider its ruling. Our remand rests entirely on our misgivings about the district court's formulation of the relevant legal principles, and implies no view whatever as to the appropriate disposition of this case.

CONCLUSION

In No. 84–5092, we reverse the district court's ruling that claim preclusion prevents the EELC from asserting its constitutional claims, and remand those claims for further proceedings. We affirm summary judgment for the Library on the Title VII claims.

In No. 84–5093, we affirm summary judgment for the Library on the Administrative Procedure Act claim, and on those constitutional claims for which Title VII provides a sufficient remedy. We reverse summary judgment on the remaining constitutional claims and remand for further proceedings. We vacate summary judgment for the Library on the Title VII claims and remand for further proceedings.

*So Ordered.*